WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| John McComish, et al., | ) | No. cv-08-1550-PHX-ROS |
| | ) | |
| Plaintiffs, | ) | **FINDINGS OF FACT AND** |
| | ) | **CONCLUSIONS OF LAW** |
| vs. | ) | |
| | ) | |
| Jan Brewer, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

The Court has denied Plaintiff's Motion for Preliminary Injunction which sought to block distribution of matching funds to participating candidates under the Citizens Clean Elections Act A.R.S. §§ 16-940 *et seq.*. (the "Act" or "Arizona Act"). Findings of Fact and Conclusions of Law in support of that decision are set forth below.

BACKGROUND

The Citizens Clean Elections Act was approved by voters in 1998. The Act sets up a voluntary system of campaign financing in which candidates who choose to be "participating candidates" may receive funds from the Citizens Clean Elections Fund ("CCEF"). Candidates who elect to participate must collect the required number of $5 "qualifying contributions" from voters registered in their district. If they qualify, they

receive a base-level grant from the Clean Elections fund.[1]  See A.R.S. §§ 16-941, -945; see also, Citizen Clean Elections Commission, "Voter Education Guide" (2008) *available at* http://www.ccec.state.az.us/ccecweb/ccecays/ccecPDF.asp?docPath=docs/2008PrimaryCandidateStatementPamphlet.pdf.

When participating candidates have opponents who are non-participating – "traditional" candidates –  they can also receive matching funds. Once a traditional candidate's contributions and expenditures exceed the base-level grant given to participating candidates, her participating opponent or opponents will receive almost dollar-for-dollar matching funds from the CCEF.  These funds cap out at  three times the applicable spending limit.[2]  Independent expenditures by Political Action Committees ("PACs")  made on behalf of a candidate – traditional or participating – or in opposition to her participating opponent also count towards the spending limit.

The first section of the statute is entitled "Findings and Declarations," which declares an intent by the people of Arizona "to create a clean elections system that will improve the integrity of Arizona state government by diminishing the influence of special-interest money, will encourage citizen participation in the political process, and will promote freedom of speech under the U.S. and Arizona Constitutions."   The provisions lay out a number of findings about the pre-Clean Elections financing system, stating that it:

> 1.  Allows Arizona elected officials to accept large campaign contributions from private interests over which they have governmental jurisdiction;
> 2.  Gives incumbents an unhealthy advantage over challengers;
> 3.  Hinders communication to voters by many qualified candidates;
> 4.  Effectively suppresses the voices and influence of the vast majority of Arizona citizens in favor of a small number of wealthy special interests;
> 5.  Undermines public confidence in the integrity of public officials;
> 6.  Costs average taxpayers millions of dollars in the form of subsidies and special privilege for campaign contributors;

---

[1] Legislative candidates receive $12,921 for the primary and $19,382 for the general election.  Corporation Commission candidates receive $82,680 for the primary and $124,020 for the general election.

[2] The matching funds are a dollar-for-dollar match minus 6% meant to compensate for the fundraising expenses incurred by traditional candidates. A.R.S. § 16-952(A).

7. Drives up the cost of running for state office, discouraging otherwise qualified candidates who lack personal wealth or access to special-interest funding; and

8. Requires that elected officials spend too much of their time raising funds rather than representing the public.

Plaintiffs and Plaintiff-Intervenors are candidates for office and a Political Action Committee who argue that these matching funds chill their political speech and are a violation of their First Amendment rights. Plaintiff John McComish is an incumbent candidate for the Arizona State House of Representatives' District 20 running as a traditional candidate. The Arizona Secretary of State has designated McComish's district as a single party dominant district favoring the Republican Party, of which McComish is a member. However, he argues that "[b]oth the Republican and Democratic Party organizations now view [his] district as being a competitive district." There are two seats available in McComish's district; each major party is allowed to nominate two candidates. Thus, McComish is running against both a subsidized Democratic opponent, Rae Waters, and a subsidized Republican opponent, Jeff Dial. As of September 22, 2008, both Dial and Waters had more cash on hand than McComish.

In his affidavit, McComish states that "in the absence of the Clean Elections Act, [he] would certainly amass campaign contributions, personal contributions or personal loans to [his] campaign beginning on September 3, 2008 in excess of $25,000." However, due to the matching fund provisions, he "will certainly neither raise campaign contributions, contribute to, nor loan [his] campaign any amount more than $14,000 above any applicable general election spending limit." Further, he states "[l]ikewise, I will be more fearful of promoting my candidacy and less active in promoting my candidacy than in the absence of the Clean Elections Act, for fear that my opposing subsidized candidate will receive one dollar for every dollar someone or some organization independently spends to support my campaign." P. Ex. 20. McComish also states that around August 20, 2008, he decided not to spend money on an "auto-dialer" program, which cost about $2,500, to avoid triggering matching funds for his opponent. McComish anticipates triggering matching funds at some point during the general election. P. Ex. 19.

1    During the primary election, McComish stated that some $6,000 was spent on his

2    behalf as an independent expenditure by the Arizona Realtors Association. McComish has

3    stated that expenditure "hurt more than it helped;" while "the expenditure on [his] behalf was

4    not consistent with what [he] was trying to do . . .[his] opponents received the cash so that

5    they could use it efficiently." The Arizona Realtors Association apparently did not confer

6    with McComish before sending the mailing.

7    Plaintiff Nancy McLain is the incumbent candidate for the Arizona House of

8    Representative's third district. She is a member of the Republican party who is running as

9    a traditional candidate. She has two participating opponents, Republican Doris Goodale and

10   Democrat Pamela Durbin, both of whom had more cash on hand than McLain as of

11   September 22nd, 2008. Due to an increase in the number of independent voters in her

12   district, McLain believes that the 2008 general election might be close. Ex. 22, pg. 72.

13   McLain states that "there is no question that . . . my campaign speech will be chilled by the

14   Act's matching funds provision," though she could not identify "specific dollar amounts that

15   [she] will not contribute or loan [her] campaign." She adds:

16       I will be made more reluctant to personally contribute or loan money to my
         campaign than I otherwise would have been in the absence of these provisions,
17       knowing that my opposing participating candidate in the general election,
         Pamela Durbin, will receive nearly one dollar for every dollar I raise and one
18       dollar for every dollar someone independently spends to support my campaign.

19   McLain has also stated that she has made the decision not to raise any more funds for the

20   2008 election, though she is unsure of whether she will return any unsolicited contributions.

21   Ex. 22, pg. 93.

22   Plaintiff-Intervenor Robert Burns is an Arizona State Senator representing Legislative

23   District 9. He is a traditional candidate running against a participating opponent. Burns

24   states that he is forced to "censor [himself] in order to avoid triggering matching funds to

25   [his] government-funded opponent." Ex. 50. He adds that he "will be forced to stop

26   accepting contributions to [his] campaign to make sure that [he does] not exceed the Act's

27   expenditure limitations for this race." Id. On one occasion, he turned away a contribution

28   check in order to avoid triggering matching funds. Ex. 155, pg. 45. Burns is running in a

1   heavily Republican district that is not one the Democrats tend to heavily target.  Ex. 155, pg.

2   10.

3       Plaintiff-Intervenor Rick Murphy is an Arizona State Representative representing

4   Legislative District 9.  He is running for re-election as a traditional candidate and has three

5   participating opponents.  Thus, for every dollar Murphy raises above the spending limit, three

6   dollars will be disbursed to his opponents – one to each participating candidate.  As a result,

7   he states, he may "be forced to forgo any fundraising in order to avoid assisting [his]

8   opponents by sending government checks directly to their taxpayer financed campaign war

9   chests."  Ex. 51.

10      The final Plaintiff-Intervenor is the Arizona Taxpayers Action Committee ("ATAC"),

11  an Independent Expenditures Committee that was organized in 2006 and made independent

12  expenditures on behalf of a legislative candidate in a primary election that same year.  The

13  group's treasurer states that the group intends to participate in 2008 legislative races,

14  however, "a decision must be made whether to engage in the political speech that represents

15  our donors' interests, but which may aid the very candidate whom Arizona Taxpayers

16  oppose."  Ex. 52.  ATAC alleges that the knowledge that its donations will aid a candidate

17  it opposes "will prevent [ATAC] from the full and unrestricted exercise of its speech," and

18  therefore that "the Act creates a climate of self-censorship resulting in less political speech."

19  However, Defendant-Intervenors note that not only has ATAC only made one donation to

20  a state legislative race in its history (it has also made at least one donation in a city council

21  race for mayor), it has "made no attempt to raise funds" in this current election cycle and has

22  no current plans to do so before the election.  Ex. 157, pg. 35, 62-66.  Further, as of August

23  13, 2008, the group had only $52.72 in its bank account.  Ex. 157, pg. 62.

24

25

26                    ANALYSIS

27                  **I. Standard**

28

1    The Ninth Circuit provides two alternate tests for granting a preliminary injunction -

2    or rather, one test with two polarized formulations.  In the first formulation, a plaintiff must

3    show:

> (1) a strong likelihood of success on the merits,
> (2) the possibility of irreparable injury to plaintiff if preliminary relief is
> not granted,
> (3) a balance of hardships favoring the plaintiff, and
> (4) advancement of the public interest (in certain cases).

7    Earth Island Inst. v. U.S. Forest Serv., 351 F.3d 1291 (9th Cir. 2003) (quoting Johnson v.

8    Cal. State Bd. Of Accountancy, 72 F.3d 1427, 1430 (9th Cir. 1995).  Alternately, a plaintiff

9    may "demonstrate[] '*either* a combination of probable success on the merits and the

10   possibility of irreparable injury *or* that serious questions are raised and the balance of

11   hardships tips sharply in his favor'" Id.  These two tests represent a continuum; "[t]hus, the

12   greater the relative hardship to [Plaintiffs] the less probability of success must be shown."

13   Earth Island, 351 F.3d at 1298.

14   Some Ninth Circuit cases also add a statement to the effect that "[i]f the movant 'has

15   a 100% probability of success on the merits,' this alone entitles it to reversal of a district

16   court's denial of a preliminary injunction, without regard to the balance of the hardships."

17   Sammartano v. First Judicial Dist. Court, 303 F.3d 959, 965 (9th Cir. 2002).  However, this

18   proposition seems to lead back only to Baby Tam & Co. v. City of Las Vegas, 154 F.3d

19   1097, 1102 (9th Cir. 1998), in which the court gave the standard for a preliminary injunction

20   as usual then decided that, in that particular case, a *permanent* injunction was in order

21   without remand to the district court for a full trial on the merits.  The court did not engage

22   in any analysis regarding the balance of the harms in that case, nor did it appear to be a

23   contested issue.  This Court has not concluded that it is appropriate for a district court to

24   discard the balance of the harms analysis where the court judges that there is any chance that

25   additional useful evidence could be adduced at a full trial on the merits,[3] especially in the

26

27   ───────────────

28   [3] In Baby Tam, the court concluded:

Because the ordinance is unconstitutional, Baby Tam has a

1  volatile and unpredictable context of an election where a court is always anchored neutrally

2  and loath to in any manner influence who will be triumphant.  This is particularly true where,

3  unlike, apparently, in <u>Baby Tam</u>, vital interests are implicated on both sides of the balance

4  of the hardships analysis.

5  **II. Application**

6  A. Plaintiffs Have Shown a Strong Likelihood of Success on the Merits.

7  The issue in dispute is whether the matching funds provisions of the Clean Elections

8  Act violate the First Amendment of the Constitution.  If it "imposes a substantial burden on

9  the exercise of the First Amendment right to use personal funds for campaign speech, [it]

10  cannot stand unless it is 'justified by a compelling state interest.'"  <u>Davis v. Fed. Election</u>

11  <u>Comm'n.</u>, 128 S. Ct. 2759, 2772 (2008).  <u>Id.</u>  In considering this question, it might be helpful

12  to look briefly at the history of campaign finance jurisprudence.  In <u>Buckley v. Valeo</u>, 424

13  U.S. 1 (1976)*,* the Supreme Court rejected a cap on expenditures by candidates of their

14  personal funds.  The Court explained that a "candidate . . . has a First Amendment right to

15  engage in the discussion of public issues and vigorously and tirelessly to advocate his own

16  election," and that a cap on personal expenditures by a candidate constitutes "a substantial,"

17  "clea[r]," and "direc[t] restraint on that right."  <u>Id.</u> at 52.  Thus, while states may place certain

18  reasonable limits on campaign *contributions*, personal expenditures may not be restrained.

19  <u>Id.</u> at 21-22, 51.  Campaign contributions may not prevent "candidates and political

20  committees from amassing the resources necessary for effective advocacy."  <u>Id.</u> at 21.

21  Subsequent decisions have added layers of nuance to <u>Buckley</u>'s original distinction.

22  Matching funds, such as those found in Arizona's Act, have been a hotbed of controversy.

23

24
25  100% probability of success on the merits of its suit to obtain a
26  permanent injunction.  No facts which might be adduced at a
   trial [on the permanent injunction] will change this result.
   Accordingly, there is no need to remand for a trial.  Baby Tam
27  is entitled to a permanent injunction prohibiting the City from
   enforcing the ordinance in its present form.

28  154 F.3d at 1102.

1  Proponents argue that they place no limitations on personal campaign expenditures or on

2  campaign contributions that might fall afoul of Buckley.  Opponents, on the other hand,

3  argue that, through forcing traditional candidates to accept expenditure and contribution

4  limits or else trigger funding for speech hostile to themselves, such schemes violate the First

5  Amendment rights of traditional candidates.

6       The First, Fourth and Sixth Circuits have found matching funds to pass constitutional

7  muster.  In N.C. Right to Life, Inc. v. Leake, 524 F.3d 427 (4th Cir. 2008), the court held that

8  "[t]he plaintiffs remain free to raise and spend as much money, and engage in as much

9  political speech, as they desire."  It continued, "They will not be jailed, fined, or censured

10  if they exceed the trigger amounts."  Similarly, the First Circuit, in Daggett v. Comm'n on

11  Governmental Ethics & Election Practices, 205 F.3d 445 (1st Cir. 2000), held that Maine's

12  matching fund provision was constitutional, writing that "[t]he public funding system in no

13  way limits the quantity of speech one can engage in or the amount of money one can spend

14  engaging in political speech, nor does it threaten censure or penalty for such expenditures."

15  Id. at 464; see also Gable v. Patton, 142 F.3d 940 (6th Cir. 1998) (holding that a Kentucky

16  campaign finance law which lifted expenditure limits for participating candidates when non-

17  participating candidates exceeded those limits was constitutional).

18       Only the Eighth Circuit has found matching fund provisions to be unconstitutional.

19  In Day v. Holahan, 34 F.3d 1356 (8th Cir. 1994), a Minnesota law provided that candidates

20  would receive one half the amount of independent expenditures made by opposing

21  candidates.  The court emphasized the "'self-censorship' that has occurred even before the

22  state implements the statute's mandates," ultimately "no less a burden on speech that is

23  susceptible to constitutional challenge than is direct government censorship."  Id. at 1360.

24  The court also found that the speech restriction could not be considered content neutral;

25  "[i]ndependent expenditures of any other nature, supporting the expression of any sentiment

26  other than advocating the defeat of one candidate or the election of another, do not trigger

27  the statute's . . . provisions."  Id. at 1361.  There was, however, one substantial difference

28  between the statute at issue in Day and the Arizona Act.  In Minnesota, the participation rate

1   among candidates was approaching 100% (in Arizona, it is closer to 60%), leading the court
2   to declare that "no interest, no matter how compelling, could be served" by the restrictions
3   on the remaining candidates.  Id.

4        Into this landscape came the recent Supreme Court decision, decided after each of the
5   above Circuits' opinions and highly relevant to the question of matching funds.  In Davis
6   v. Fed. Election Comm'n., the Supreme Court considered the constitutionality of the so-
7   called Millionaire's Amendment of the Bipartisan Campaign Reform Act of 2002 ("BCRA").
8   2 U.S.C. §441a-1(a); id. at 2774.  The Millionaire's Amendment was triggered when a non-
9   participating candidate's personal expenditures caused her total campaign expenditures to
10  exceed $350,000.  At that point, an opposing participating candidate was allowed to receive
11  individual contributions at three times the normal limit (the limit for non-participating
12  candidates remained the same), and could accept coordinated party expenditures without
13  limit.  Id. at 2766.   The Davis court found that the asymmetry of this arrangement
14  "impermissibly burden[ed] [the plaintiff's] First Amendment right to spend his own money
15  for campaign speech."  Id. at 2771.  Thus, although under the BCRA candidates can choose
16  to spend their own money as desired, they "must shoulder a special and potentially
17  significant burden if they make that choice."  Davis, 128 S.Ct. at 2771.

18       Because the BCRA "impose[d] a substantial burden on the exercise of the First
19  Amendment right to use personal funds for campaign speech, the provision [could] not stand
20  unless it [was] 'justified by a compelling state interest.'"  Id. at 2772.  The Supreme Court
21  found that the government's stated interest of "level[ing] electoral opportunities for
22  candidates of different personal wealth" was not a compelling state interest.  Id. at 2773.
23  "[P]reventing corruption or the appearance of corruption" *are* legitimate.  Id.  However, it
24  did not find that the BCRA was justified by such an interest; "reliance on personal funds
25  *reduces* the threat of corruption, and therefore [the challenged provision], by discouraging
26  use of personal funds, disserves the anticorruption interest."  Id. (emphasis in original).

27       The Millionaire's Amendment is not the same as Arizona's matching funds provision.
28  Indeed, in its decision that it impermissibly burdened speech rights, the asymmetry of the

1   Millionare's Amendment – which raised contribution limits for participating but not

2   traditional candidates – was key.  The Supreme Court noted that as there is "no constitutional

3   basis for attacking contribution limits on the ground that they are too high," if the "elevated

4   contribution limits applied across the board, Davis would not have any basis for challenging

5   those limits."  Id. at 2771.  However, the Davis court focused not merely on the fact that the

6   contributions limit differs for participating and non-participating candidates, but on the fact

7   that "the vigorous exercise of the right to use personal funds to finance campaign speech

8   produces fundraising advantages for opponents in the competitive context of electoral

9   politics."  Id. at 2772.  It, too, cited to Pacific Gas & Electric Company v. Public Utilities

10  Commission noting that, in that case, it found "infringement on speech rights where if the

11  plaintiff spoke it could be forced to help disseminate hostile views."  Id. at 2772 (internal

12  quotations omitted).  In that case, the Supreme Court expounded on the constitutional

13  dangers of such a scheme, writing that while one does not "have the right to be free from

14  vigorous debate," one "*does* have the right to be free from government restrictions that

15  abridge its own rights in order to 'enhance the relative voice' of its opponents."  475 U.S. 1,

16  14 (1986) (emphasis in original).  The "statutorily imposed choice" provided by the BCRA

17  was not sufficient to save its constitutionality.  Davis, 128 S. Ct. at 2772.

18          Ultimately, though the Arizona Act's mechanism for funding differs, it enforces

19  substantially the same coercive choice on traditional candidates – to "abide by a limit on

20  personal expenditures" or else endure a burden placed on that right.  Id.  And unlike in

21  Buckley, the schemes contemplated in Davis and presently do not allow a candidate to, "by

22  forgoing public financing, . . . retain the unfettered right to make unlimited personal

23  expenditures."  Id.  Under both laws, "a candidate who wishes to exercise that right has two

24  choices: abide by a limit on personal expenditures or endure the burden that is placed on that

25  right," by "discriminatory contribution limits" in Davis and by matching funds under the

26  Arizona Act.  Id.  The Arizona Act imposes a substantial burden on the First Amendment

27  right to use personal funds for campaign speech.

28

1      The next question, then, is whether the regulation is justified by a compelling state

2   interest.  In <u>Davis</u>, the Supreme Court explicitly rejected the idea that "level[ing] electoral

3   opportunities" was a compelling government interest, writing that it "has ominous

4   implications because it would permit Congress to arrogate the voters' authority to evaluate

5   the strengths of candidates competing for office."  <u>Id.</u> at 2773.  It noted further that

6           [d]ifferent candidates have different strengths.  Some are wealthy; others have
            wealthy supporters who are willing to make large contributions.  Some are
7           celebrities; some have the benefit of a well-known family name.  Leveling
            electoral opportunities means making and implementing judgments about
8           which strengths should be permitted to contribute to the outcome of the
            election.

9   <u>Id.</u>  The second and seventh of the Act's Findings – that the pre-Act system gave an

10  unhealthy advantage to incumbents and that it discourages otherwise qualified candidates

11  who are not independently wealthy – overlap significantly with this interest.  Though the

12  phrasing of the second finding, at least, hints that it is aimed at which candidates choose to

13  run as well as at leveling the opportunities of those who are already candidates, it still

14  constitutes governmental interference in the process of selecting candidates and elected

15  officials that the Supreme Court has found impermissible.   These Findings cannot be used

16  to justify the burden on speech the Act imposes.

17      Reducing corruption and the appearance of corruption *are* compelling government

18  interests.  In <u>Davis</u>, the Supreme Court noted that "[p]reventing corruption or the

19  appearance of corruption are the *only* legitimate and compelling government interests thus

20  far identified for restricting campaign finances" <u>Id.</u> at 2773 (quoting <u>Federal Election</u>

21  <u>Comm'n v. National Conservative Political Action Comm</u>, 470 U.S. 480, 496-97 (1985)

22  (internal quotations omitted) (emphasis added).  Several of the Findings in the Act – notably

23  the first, fourth, fifth, and sixth – fit comfortably under a "reduction of corruption or its

24  appearance" heading.  Defendants point to a number of pre-Act newspaper articles that

25  demonstrate, at least, a public perception of or public discourse about corruption of the

26  electoral process in Arizona.  Ex. 102, 103; P/I hearing.  Defendants also provide the

27  declaration of Prof. Kenneth Mayer, a political science professor at the University of

28  Wisconsin, Madison, who states in his report that Clean Elections has "made Arizona state

legislative elections more competitive," decreasing the overwhelming advantage of incumbents and increasing the number of highly contested races. Ex. 119, pg. 6-7. He adds that matching fund provisions are crucial to the success of clean elections programs; in Wisconsin, for instance, only 15.3% of candidates took public funding where there was no possibility of matching funds. Id. at 8. Ultimately, these more competitive races give incumbents "an incentive to be more responsive to the views of the district and to work towards optimal public policy rather than put all of their effort into fundraising." Id. at 10.

However, he also notes that "[t]he academic literature has not found a strong relationship between campaign contributions and official acts, in part because we are unable to observe most of what elected officials do." Id. at 9. Further, Plaintiff's expert Dr. Marc Osborn argues that "Arizona's campaign contribution limits are adequate at reducing potential interest group influence without the clean elections funding including its matching funds provisions." Ex. 14. He adds:

> Even without the Citizen's Clean Elections Act's Matching funds provisions, Arizona already has an aggressive set of campaign finance restrictions that limit both the ability of non-participating candidates to receive concentrations of contributions and limits individual donors and PACs from concentrating contributions.

Id.

Plaintiffs also provide evidence regarding potential gaming of the matching funds system. For instance, because matching funds will be provided to participating candidates for expenditures that PACs make on behalf of traditional candidates, PACs can run ineffective, unwished for advertising that generates funds for a participating opponent to use at her discretion. Both McComish and McLain have stated that ineffective PAC expenditures have been made on their behalf without their prior knowledge.[4] Ex. 19, pg. 31; Ex. 22, pg.

---

[4] McLain stated in her deposition that the PAC mailer done in her behalf also supported two other candidates. She stated:

> I have significant policy disagreements – differences, shall we say, not disagreements, with both the Senator, Ron Gould, and with Mrs. Groe. I was not comfortable being associated with the two of them. I had tried to run my own campaign and stand on my own merits.

41.  Though neither have alleged that those expenditures were made as part of a deliberate strategy to generate matching funds for their campaigns, the potential for such strategies to be utilized – or to appear to be utilized – remains an avenue to corrupt the Act's goal and certainly to give it the appearance of corruptibility.

Similarly, where more than one seat is available in a particular district or in a statewide race for Corporation Commission, candidates may run as an unofficial slate, something which appears to have happened in at least a couple of races.  Plaintiff Tony Bouie provided reliable evidence that such a strategy had been used against him in the primary election (which he lost).  Ex. 2.  Bouie had a traditional and a participating opponent who shared, at a minimum, common advertising urging voters to cast each of their two votes for the two candidates. Id.  As a result, every dollar spent above the spending cap by either Bouie or his traditional opponent generated matching funds for the participating opponent, who could then use those funds for the benefit of both slate candidates.  Similarly, in the general election, candidates coordinated advertising with each other and, in some cases, shared a common campaign manager.  Ex. 9, pg. 41, 45.  Candidate for Corporation Commission Paul Newman, in his deposition, also stated:

> I hear that there was a quote, unquote, team of Republicans, one who is going to be running traditionally and two that were going to be running clean, I knew all three individuals, two pretty well . . . And I was pretty outraged about that and I didn't want that team to get elected to the Corporation Commission.  And I thought that the outside money interests and having some people run as clean, I thought that was manipulation of the system.

Id. at 79.  Whether these slate strategies have been effective or not (and whether Newman's information was correct or not), it is clear that they may attribute to the *appearance* of corruption and the appearance that the Act may be gamed to provide matching funds for speech actually made in a participating candidate's own indirect benefit.[5]

---

Ex. 22, pg. 41.

[5] Defendants note that there are limits to slate strategies by law - "[c]andidates cannot spend their monies supporting other candidates.  See A.R.S. §§ 16-905(H), -948(C), Ariz. Admin. Code § R. 2-200104(C)(5).  Each candidate must pay his or her own expenses and

1    This potential for gamesmanship mitigates against the anti-corruption interest of the

2    Act not by nullifying any anti-corruption gains but by creating entirely new corruption

3    concerns and injecting them into the public sphere.  As Defendants have shown at this point

4    only modest anti-corruption benefits, and as even those remain largely unverifiable, the Act

5    is not justified by the compelling government interest of reducing corruption or the

6    appearance of corruption.

7    Defendant-Intervenors point to three other potential compelling state interests: (1)

8    "facilitat[ing] communication by candidates with the electorate"' (2) "freeing candidates

9    from the pressures of fundraising," Vote Choice, Inc. v. DiStefano, 4 F.3d 26 (1st Cir. 1993)

10   (internal citations and quotations omitted), and (3) creating a viable public financing system

11   that does not "fund[] hopeless candidacies with large sums of public money."  Buckley v.

12   Valeo, 424 U.S. 1, 96 (1976). This third interest need not be considered here.  It has never

13   been suggested that this was a goal of the Act's enactment.  Furthermore, there has been no

14   argument made that this goal cannot be achieved without burdening speech – by adjusting

15   the public funding available on the basis of whether a district is designated as a single party

16   dominant district, for instance.

17   The third and eight Findings of the Act, however, do go toward freeing candidates to

18   communicate with the electorate rather than spending their time fundraising.  There is no

19   reason to conclude, however, that this is a compelling government interest that can justify

20   the burdens on free speech that are created by the Act.  It has never been found so by the

21   Ninth Circuit and the Supreme Court's formulation in Davis – that "[p]reventing corruption

22   or the appearance of corruption are the *only* legitimate and compelling government interests

23

24

25

_____

26   report them on the campaign finance reports."  Be this as it may, it does not change the fact
     that candidates may share advertising and associate themselves as a slate, which allows
27   matching funds generated by a candidate to have them used in their own support, a blatant
28   subversion of the Act's principles.

1   thus far identified for restricting campaign finances" – strongly implies that few interests
2   indeed would be sufficient to justify such restraints.[6]

3        Ultimately, Plaintiffs have shown a high likelihood of success on the merits. Because
4   of the questions raised by Defendants and Defendant-Intervenors regarding possible
5   compelling state interests that justify the Act's burden on free speech, this Court declines to
6   state today that Plaintiffs have shown a *certainty* of success on the merits such that, under
7   one possible reading of Ninth Circuit jurisprudence, a preliminary injunction *must* be
8   granted.

9        B. Plaintiffs Have Shown Irreparable Injury.

10       Plaintiffs and Plaintiff-Intervenors will suffer irreparable injury both through the
11  dispensation of funds that will be used to oppose them and through the mere fact that their
12  speech is being burdened. The Supreme Court has held that "[t]he loss of First Amendment
13  freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."
14  Elrod v. Burns, 427 U.S. 347, 373 (1976).

15       C. The Balance of Harms and the Public Interest Lie with Defendants.

16       In order to grant a preliminary injunction, the balance of the harms must tilt in
17  Plaintiffs' favor and the injunction must usually be in the public interest. This third criterion
18  is particularly important here where the injunction seeks to interfere with an ongoing state
19  election. It is not only the parties to this suit that would be affected by issuance of an
20  injunction. Each candidate that stands to trigger or receive matching funds, and the public
21  itself, which has an overriding interest in free and fair elections, also stand to gain or lose by
22  an injunction.

23       At the outset, courts will interfere with an election in process only in extraordinary
24  circumstances. See Southwest Voter Registration Educ. Project v. Shelley, 344 F.3d 914,
25  919 (9th Cir. 2003) (holding that the California recall vote should not be enjoined due to

26

27       _____
28       [6] For this reason, Defendant-Intervenor's citation to Buckley in support of this point
     is rather unpersuasive.

1  questions about whether punch card voting machines violated the Equal Protection Clause,
2  in part because "Interference with impending elections is extraordinary and interference with
3  an election after voting has begun is unprecedented."); see also Soules v. Kauaians for
4  Nukolii Campaign Committee, 849 F.2d 1176, 1179 (9th Cir. 1988) (noting that "the voiding
5  of a state election is a 'drastic if not staggering' remedy."); see also Reynolds v. Sims, 377
6  U.S. 533, 585 (1964) (holding that, in legislative apportionment cases, "under certain
7  circumstances, such as where an impending election is imminent, and a State's election
8  machinery is already in progress, equitable considerations might justify a court in
9  withholding the granting of immediately effective relief" even where the scheme has already
10 been found unconstitutional.).  To no surprise, Plaintiffs do not ask the Court to void the
11 results of an election or to enjoin an election in its entirety.  However, early voting began
12 October 2nd, 2008, and an injunction of even relatively limited scope must still be considered
13 in the context of an ongoing election.

14      On the Plaintiffs side, they have shown a very high likelihood that their First
15 Amendment rights of free speech are being restrained.  Matching funds disbursed against
16 them as a result of an apparently unconstitutional statute will be used against them by
17 campaign opponents.  Several Plaintiffs have provided evidence that their speech is actually
18 being suppressed as a result of their apprehensions of triggering matching funds.  This harm
19 – particularly as it can be extrapolated to other non-party traditional candidates running in
20 contested races – is not insignificant.  Further, as Plaintiffs point out, "neither the Government
21 nor the public generally can claim an interest in the enforcement of an unconstitutional law."
22 ACLU v. Reno, 217 F.3d 162, 181 (3d. Cir. 2000) (internal quotations omitted).

23      Both the government and the public can, however, claim an interest in a free and fair
24 election.  Here, that is a dual edged sword.  On the one hand, the election is inextricably
25 linked with the constitutional violations that have pervaded it.  On the other hand, the fact
26 remains that it is *inextricably* linked; to halt matching funds now would not undo the harm
27 that has been done.  Instead, it would disrupt the justifiable expectations of participating
28 candidates who – matching funds having been in place for ten years – had every reason to

rely on them.  Defendants have provided evidence showing that, for a number of candidates, matching funds were an important part of their decision to run as participating candidates. Ex. 124; Ex. 114; Ex. 121; Ex. 122.  Further, at least one of these candidates has stated that he would not be able to run an effective campaign were matching funds not available.  Ex. 122.  Nor is it realistic to expect that participating candidates have the networks and resources available to develop and implement an effective fundraising strategy at this late date.

Plaintiffs argue that participating candidates were on notice that matching funds may be cut off due to the provisions in 16-954(j) of the statute and that they cannot be said to have justifiably relied on distribution of matching funds.  However, that statutory provision reads:

> If the commission cannot provide participating candidates with all monies specified under sections 16-951 and 16-952, as decreased by any announcement pursuant to subsection E of this section, then the commission shall allocate any reductions in payments proportionately among candidates entitled to monies and shall declare an emergency.  Upon declaration of an emergency, a participating candidate may accept private contributions to bring the total monies received by the candidate from the fund and from such private contributions up to the adjusted spending limits . . . .

The provision – which follows and references provisions discussing what will happen if enough money does not remain in the fund – is clearly a reference to fiscal emergencies rather than eleventh hour litigation.  And subsection (D) of that provision specifies that "[a]t least once per year, the commission shall project the amount of monies that the fund will collect over the next four years and the time such monies shall become available."  The statute contemplates a sudden fiscal emergency but makes provisions for it.  It cannot be stretched to mean that participating candidates ought to have been ready to have their funding source halted as a result of litigation mere weeks, or even mere months, before the election.

The timing of this litigation also deserves special attention.  Defendants and Defendant-Intervenors argue that Plaintiffs delayed unreasonably in bringing this suit. Though they provide evidence that many of the Plaintiffs have known about the Clean Elections Act for a matter of years, the Court is not persuaded that they need necessarily have been required to bring their challenge before Davis was released and shed new light on the

1   potential constitutionality of the matching funds provisions.  See Lathan v. Brinegar, 506

2   F.2d 677, 692 (1974) (holding that it could not be said that the plaintiff was "guilty of an

3   extreme lack of diligence in raising [the] issue" as "NEPA which has a substantial influence

4   upon our interpretation of the effects of the amendments . . . was not operative until January

5   1, 1970, less than six months before this action was filed."). However, Davis was decided

6   on June  26, 2008, well before the general election and even the primary.  The delay of

7   almost two months before any action was filed in this court has to bear against the urgency

8   of Plaintiffs' claim and certainly mitigated against any real possibility that participating

9   candidates might have time, after an injunction, to develop their own fundraising strategy.

10  Further, precedent shows that such a delay indicates "an absence of the kind of irreparable

11  harm required to support a preliminary injunction."  Citibank, N.A. v. Citytrust, 756 F.2d

12  273, 276 (2d Cir. 1985).

13        Ultimately, in the extraordinary context of an election in progress, Plaintiffs and

14  Plaintiff-Intervenors have not demonstrated sufficient harm to find that the balance of harms

15  and the public interest tilts in their favor.  The countervailing harm that would be done to

16  candidates that relied on Clean Elections funding and the significant interest the public has

17  in the smooth functioning of an election, one that would be compromised if participating

18  candidates were unable to deliver their message to voters as planned, are sufficient to push

19  the balance of harms in their direction, especially as the election is upon us.  This Court will

20  not interfere with the fortuitous currents and eddies of this vital democratic process.  Simply,

21  the public interest would not be served by granting an injunction.

22                              CONCLUSION

23        Plaintiffs have shown a very strong likelihood of success on the merits.  However,

24  given the extraordinary balance of the harms required in the context of an ongoing election,

25  Plaintiffs have not met their burden in showing that they are entitled to a preliminary

26  injunction.  For this reason, Plaintiffs' Motion was denied.

27

28

1

2

3

4

5      DATED this 17th day of October, 2008.

6

7

8

9

10

11

12

13

14

15

16

17      _____
                    Roslyn O. Silver
18              United States District Judge

19

20

21

22

23

24

25

26

27

28